UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICH SHELLEY, *et al.*,

    Plaintiffs,

v.

AMERICAN POSTAL WORKERS UNION,

    Defendant.

Civil Action No. 11-0677 (BAH)
Judge Beryl A. Howell

**MEMORANDUM OPINION**

Three union members, who are appearing as *pro se* plaintiffs in this case, have significant concerns with a tentative collective bargaining agreement ("CBA") negotiated on their behalf by their union representatives, and seek additional time before the ratification vote in order to communicate those concerns to fellow union members. On April 6, 2011, the plaintiffs Rich Shelley, James Ozanian and Lance Coles, who are members of the American Postal Workers Union ("APWU"), AFL-CIO, filed motions for a temporary restraining order and a preliminary injunction to enjoin the defendant APWU from mailing ballots on April 8, 2011, to its members in connection with the ratification of the new CBA between the APWU and the United States Postal Service ("USPS"). The plaintiffs claim the APWU violated the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et seq*, by conducting the ratification vote of the CBA in a way that deprives the plaintiffs of a "meaningful and informed vote." Compl., Prelim. Statement, at 1.

After reviewing the plaintiffs' motions for injunctive relief, the defendant's opposition papers, as well as the accompanying declarations, exhibits and applicable law, and following oral argument, the Court denies the plaintiffs' motions for a temporary restraining order and a preliminary injunction, and dismisses the Complaint for lack of subject matter jurisdiction.

I.  **BACKGROUND**

The APWU is a national labor organization headquartered in Washington, DC. Compl., Parties, at 2. This union represents over 200,000 employees of the USPS, including clerks, maintenance employees, motor vehicle service employees and other categories of USPS employees.  Pls.' Mot. TRO and Prelim. Inj., Pls.' Decl. (hereinafter "Pls.' Decl."), ¶ 3. The current collective bargaining contract between the APWU and USPS was scheduled to expire on November 20, 2010, but has continued during negotiations for a new contract. Def.'s Opp. to Pls.' Mot. TRO and Prelim. Inj., Elizabeth Powell Decl. (hereinafter "Powell Decl."), Exs. D, E.

On Saturday, March 12, 2011, the APWU reached a tentative new collective bargaining agreement with the USPS and, on Monday, March 14, 2011, posted a seven page summary of the tentative agreement on its website. Powell Decl., ¶ 11; Pls.' Decl., ¶ 4. The APWU subsequently held thirteen briefing meetings around the country and an online webinar, and mailed bulletins regarding the agreement and posted information online, in order to educate members about its terms. Powell Decl., ¶¶ 11-19; Pls' Decl., ¶¶ 7, 8.  On March 22, 2011, the APWU posted the full collective bargaining agreement on its website, and stated that it planned to proceed with a mail ratification vote, ballots for which would be mailed to members on April 8, 2011, with a return date of May 10, 2011. The ballots will be counted after that date. Def.'s Mem. in Opp. to Pls.' Mot. TRO and Prelim. Inj. (hereinafter "Def.'s Mem."), at 2 n.2.  The APWU explains that the process used for mailing ballots and ratifying the contract are fully consistent with the

union's constitution and bylaws, Powell Decl., ¶¶ 6-8, and the plaintiffs do not dispute this point.[1]

In addition, the APWU states that the timetable for ratification of the tentative CBA at issue in this case compares favorably to ratification timetables followed in two prior instances, and has given members more, not less, time to consider the terms of the agreement. Powell Decl., ¶ 9. Specifically, the total number of days from announcement of the tentative agreement to the mailing of ratification ballots was 20 days and 12 days in 2005 and 2006, respectively, compared to 25 days for the instant agreement; and the total number of days from announcement of the tentative agreement to ballot receipt due date was 38 days and 34 days in 2005 and 2006, respectively, compared to 57 days for the instant agreement. *Id.*

The plaintiffs complain that, despite these efforts, the APWU did not include many specific provisions of the tentative agreement in its "highlight summary," did not afford sufficient time for questions and answers at its meetings, and have denied plaintiffs' requests for additional time before the mailing of ratification ballots "to organize for a 'no vote.'" Pls.' Decl., ¶¶ 6, 7, 14. In response to the union's ratification vote, the plaintiffs formed a Facebook page, and have distributed flyers and emails to members urging them against ratification of the agreement. The plaintiffs now seek a delay of thirty days in the APWU's mailing of ratification ballots to afford them more time to inform union members regarding the agreement.

## II. PLAINTIFFS' MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

The court may issue a temporary restraining order ("TRO") when a movant is faced with the possibility that irreparable injury will occur even before the hearing for a preliminary

---

[1] Transcript of Oral Argument, Shelley v. Am. Postal Workers Union, No. 11-cv-677 (April 7, 2011) (in response to the Court's question whether the plaintiffs were claiming that the APWU was violating the rules and regulations set forth in the union's constitution and bylaws, Mr. Shelley responded: "No. Only the LMRDA.").

3

injunction required by Federal Rule of Civil Procedure 65(a) can be held. FED. R. CIV. P. 65(b)(1). The purpose of a TRO is to maintain the status quo of a case until the court has an opportunity to hear a request for fuller relief. *Id.; see, e.g., Hosp. Res. Pers., Inc. v. United States*, 860 F. Supp. 1554, 1556 (S.D. Ga. 1994) (explaining that the purpose of a TRO is to preserve the status quo pending a hearing for a preliminary or permanent injunction). The factors that apply in evaluating requests for a TRO are identical to those that apply in evaluating requests for preliminary injunctions. *See Al-Fayed v. C.I.A.*, 254 F.3d 300, 303 n.2, (D.C. Cir. 2001); *Sobin v. Bechtol*, 168 Fed. Appx. 452, 452 (D.C. Cir. 2005) (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 57 (D.C. Cir. 1977)); *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009); *Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001). In this case, the Court considers the motions for both the TRO and preliminary injunction together.

### A. STANDARD OF REVIEW

To warrant injunctive relief, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). It is an extraordinary form of interim relief, however, and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations omitted). These four preliminary injunction factors "interrelate on a sliding scale," and the Court must balance the strengths of the factors against each other. *Ass'n of Cmty. Orgs. for Reform Now v. FEMA*, 463 F. Supp. 2d 26,

33 (D.D.C. 2006) (citing *Serono Labs v. Shalala,* 158 F.3d 1313, 1318 (D.C. Cir. 1998)). A particularly weak argument for one factor may be more than the other factors can compensate for, however. *See, e.g., Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1507 (D.C. Cir. 1995) (finding that given the inadequacy of the plaintiff's prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief). In meeting the requisite burden for injunctive relief, "it is particularly important for the movant to demonstrate a likelihood of success on the merits." *Konarski v. Donovan*, No. 10-cv-1733, 2011 WL 383995, at *2 (D.D.C. Feb. 7, 2011). Without a "substantial indication" of the plaintiff's likelihood of success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Elite Entm't, Inc. v. Reshammiya*, No. 08-cv-0641, 2008 U.S. Dist. LEXIS 31580, at *4 (D.D.C. Apr. 18, 2008) (citing *Am. Bankers Ass'n v. Nat'l Credit Union Admin.,* 38 F. Supp. 2d 114, 140 (D.D.C. 1999)). Assessing the likelihood of success on the merits "does not involve a final determination of the merits, but rather the exercise of sound judicial discretion on the need for interim relief." *Nat'l Org. for Women, Wash. D.C. Chapter v. Soc. Sec. Admin. of the Dep't of Health and Human Servs.*, 736 F.2d 727, 733, (D.C. Cir. 1984) (footnote and internal quotation marks omitted).

    **B. DISCUSSION**

    Plaintiffs' motions for injunctive relief require the Court to assess prospectively the merits of the plaintiffs' case and their need for immediate judicial intervention. Although plaintiffs claim irreparable harm if the APWU goes forward with its ratification mailing on April 8, 2011, plaintiffs challenge to the ratification process does not appear to have a likelihood of success, nor does the harm they allege rise to the level that warrants extraordinary relief.

### 1. Lack of Subject Matter Jurisdiction

At the outset, in evaluating plaintiffs' likelihood of success on the merits, the Court must first determine that it may properly exercise jurisdiction over the action. Plaintiffs assert that the Court has subject matter jurisdiction under Title I of LMRDA, 29 U.S.C. §§ 411-12. Title I protects union members against discriminatory application of union rules. *See* 29 U.S.C. § 411(a)(1). Title I further provides that "any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 412. Thus, the question of subject matter jurisdiction turns on whether plaintiffs have sufficiently alleged a violation of Section 411.

> The pertinent provisions of the LMRDA, 29 U.S.C. § 411(a), provide:
>
> **(a)(1) Equal rights.** Every member of a labor organization shall have equal rights and privileges within such organization to . . . vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
>
> **(2) Freedom of speech and assembly.** Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, . . . . upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

In *Calhoon v. Harvey,* 379 U.S. 134 (1965), members of a union alleged that certain provisions of a union's constitution and bylaws violated the LMRDA because the provisions infringed their right to nominate candidates in an election. The Supreme Court found that the district court's jurisdiction under Title I "depends entirely upon whether this complaint showed a

violation of rights guaranteed by [Title I, 29 U.S.C. § 411(a)(1)]." *Id.* at 138. Regarding the terms of Section 411, the Court explained:

> Plainly, this is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote. And Congress carefully prescribed that even this right against discrimination is 'subject to reasonable rules and regulations' by the union. The complaining union members here have not been discriminated against in any way and have been denied no privilege or right to vote or nominate which the union has granted to others.

*Id.* at 139. The Court concluded that the district court had properly found that the plaintiffs failed to demonstrate that they had been discriminated against and therefore their complaint was properly dismissed for lack of subject matter jurisdiction. *Id.* at 141. *See also Bunz v. Moving Picture Mach. Operators' Protective Union Local 224*, 567 F.2d 1117, 1120 (D.C. Cir. 1977) ("federal courts do not possess jurisdiction to enforce union constitution and by-laws where there has been no violation of a specific right enunciated in §101(a) of the Act . . . to prevail, therefore, [plaintiff] must be able to predicate jurisdiction on a violation of a specific right enunciated in § 101(a)(1)")(quotations omitted); *Carothers v. Presser*, 818 F.2d 926, 931 (D.C. Cir. 1987) ("First and foremost, the court must determine whether the union's conduct deprived the plaintiffs of a right *specifically enumerated* in the statute, such as the right to an equal vote, found in subsection 101(a)(1), or the right to 'express any views, arguments, or opinions,' found in subsection 101(a)(2)."). Therefore, prior to granting any relief, the Court must identify the specific statutory right in Section 411 that has been infringed. *Carothers*, 818 F.2d at 929.

The plaintiffs here do not allege that the union has denied them any rights or privileges to vote, attend meetings, participate in the meetings, meet and assemble freely with other members, or otherwise express their views, arguments or opinions, including at meetings of the union, about the tentative collective bargaining agreement. Moreover, they do not contend that they are being treated any differently than other members regarding the ratification of the tentative

7

agreement. In short, set against the plain terms of the statute authorizing jurisdiction, the APWU argues that "Plaintiffs have not alleged that they are being discriminated against in the exercise of their rights as union members." Def.'s Mem., at 2.

Furthermore, the plaintiffs do not argue that the APWU is conducting the ratification of the CBA in a manner that violates or is contrary to the union's constitution and bylaws. Transcript of Oral Argument, Shelley v. Am. Postal Workers Union, No. 11-cv-677 (April 7, 2011) (in response to the Court's question whether the plaintiffs were claiming that the APWU was violating the rules and regulations set forth in the union's constitution and bylaws, Mr. Shelley responded: "No. Only the LMRDA."). Thus, APWU's assertion that the union's ratification process comports with its rules and regulations is uncontested. Powell Decl., ¶¶ 5-8. Finally, the plaintiffs do not challenge the reasonableness of the APWU's constitution or bylaws.

Plaintiffs contend that Section 411(a) protects their right to have "a meaningful and informed vote," and that this is the violation that confers jurisdiction on this Court. Compl., at 5. The circumstances in which courts have determined that a denial of the "equal right to vote" was present to support jurisdiction have included where the union circulated inadequate or misleading information about matters to be voted upon, the union refused to provide opponents access to membership mailing lists, ballots were submitted in an unsuitable form, or minority ballots were deprived of their effectiveness in plain disregard of the union's own bylaws. *See Bunz*, 567 F.2d at 1121-22 (collecting cases). None of these circumstances is sufficiently alleged here to rise to the level of a violation of the plaintiffs' rights under Section 411.

The closest that the plaintiffs come to alleging a violation of their right to a meaningful vote is their charge that the union's initial summary of the CBA did not address all provisions in the agreement and, due to the complexity of the CBA, they have had insufficient time to share

their concerns about the agreement with their fellow union members. The Court makes no evaluation of the merits of the plaintiffs' concerns about the CBA. The focus of this Court's review is whether plaintiffs' complaint that the timetable for a ratification vote is too short demonstrates a violation of rights protected under Section 411. Although the plaintiffs allege that the timetable for ratification fails to provide them an opportunity for a meaningful vote, absent some allegation that the APWU is expediting the ratification process or departing from previous procedure, which the plaintiffs do not challenge as unfair, the plaintiffs' claim is outside even the broad view of the statute adopted by this Circuit. In *Bauman v. Presser*, for example, the court found that union members' Section 411(a) rights were violated when union members did not know that the union was negotiating a new agreement, "ballots were immediately mailed after the surprise announcement of the tentative agreement," and there was an "abbreviated pre-ratification process" that made it "virtually impossible to disseminate literature to thousands of UPS employees nationwide. . . ." *Bauman v. Presser,* No. 84-cv-2699, 1984 WL 3255 at *8 (D.D.C. Sept. 19, 1984).

The APWU's actions in the instant case are not analogous to the situation presented in *Bauman*. The APWU's prior collective bargaining agreement expired in November 2010 and members were eagerly anticipating, if not hoping for, a new CBA. The plaintiffs concede that the timetable for ratification does not vary from the time periods provided for earlier ratification votes, Transcript of Oral Argument, Shelley v. Am. Postal Workers Union, No. 11-cv-677 (April 7, 2011) (Mr. Shelley: "The time doesn't vary too much from the ratification times in the past."), and that the defendants are not obstructing the plaintiffs' already considerable efforts to express their opposition to the agreement through meetings, conference calls, flyer distribution, and on the Internet through social networking sites. Absent a claim that the union is unevenly applying

its rules to the plaintiffs, that the union is withholding information, or issuing misleading, incorrect or inadequate information, about the CBA, or a challenge to the reasonableness of the union's constitution and bylaws, this Court does not have subject matter jurisdiction over this suit, which must therefore be dismissed.

Even assuming, *arguendo*, that the Court could properly exercise subject matter jurisdiction over this suit, however, the plaintiffs have failed to sustain their burden for the extraordinary relief they seek.

### 2. Plaintiffs Do Not Demonstrate A Likelihood of Success On the Merits

Plaintiffs' motions for injunctive relief require the Court to assess prospectively the merits of the plaintiffs' case and their need for immediate judicial intervention. To demonstrate a likelihood of success on the merits, the plaintiffs must demonstrate that without a thirty-day delay of the CBA ratification vote, the APWU will deny them a 'meaningful opportunity to vote' on the CBA in violation the rights afforded to the union members under the LMRDA. The plaintiffs primarily allege that the CBA is complex and they need more time to understand its full implications and to organize an opposition vote. The plaintiffs additionally argue that the APWU has devoted "extensive efforts" to sell the new agreement and have denied the plaintiffs "any kind of equal access." Compl., at 7; Pls.' Decl., ¶ 15. Despite plaintiffs' arguments, the Court finds that the plaintiffs' rights under the LMRDA will not be violated if the APWU proceeds with the ratification vote on April 8, 2011, and that there is no evidence on the record before the Court that the APWU sought to inhibit the plaintiffs' efforts to mount an opposition to the CBA in violation of the LMRDA. The Court therefore holds that the plaintiffs do not ultimately have a likelihood of success in their legal challenge.

The LMRDA was enacted to ensure "the full and active participation by the rank and file in the affairs of the union." *Am. Fed'n of Musicians v. Wittstein,* 379 U.S. 171, 182-83 (1964). Title I of the LMRDA, 29 U.S.C. § 411, sets forth a bill of rights for union members in order to guarantee that labor organizations remain representative and democratic. *Bauman,* 1984 WL 3255 at *7 ("By enacting Title I of the LMRDA . . . Congress determined that there should not be any sacrifice in the 'members' rights to determine the course of their organization' and thus, the 'balance was struck in favor of union democracy,'" quoting *Navarro v. Gannon,* 385 F.2d 512, 518 (2d Cir. 1967)). While the rights guaranteed under Section 411 are "designed to ensure that unions adhere to certain basic democratic principles," courts are instructed not to read the broad language of Section 411(a) as "a mandate for courts to impose on labor unions whatever procedures or practices they regard as 'democratic.'" *Carothers*, 818 F.2d at 934. Section 411 is "not intended to constitute an open invitation to the courts to intervene in the internal affairs of unions." *Bauman*, 1984 WL 3255 at *6. Indeed, there is a "general Congressional policy to allow unions great latitude in resolving their own internal controversies." *Calhoon*, 379 U.S. at 140. Federal courts have applied a long-standing policy of avoiding judicial interference in a union's self-governance and internal affairs. *Fish v. Huddell*, 51 F.2d 319, 320 (D.C. Cir. 1931). Consistent with this policy, the LMRDA "does not give courts a license to interfere broadly in internal union affairs." *Morrissey v. Curran*, 650 F.2d 1267, 1273 (2d Cir. 1981); *see also Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir. 1971).

In the context of collective bargaining agreements, "the notion of 'democracy' embodied in the LMRDA must be considered against the core principles that underlie the National Labor Relations Act ("NLRA") . . . This is so because Congress perceived that promotion of the collective bargaining process – at the expense of individual worker autonomy – would enable

11

labor and management 'to substitute peaceful means of dispute resolution – grievance procedures and arbitration – in place of economic warfare.'" *Carothers*, 818 F.2d at 934. The "ratification of a collective bargaining agreement is an internal union affair and [] the court should not interfere when the judgment of the union's leadership appears to be fair and reasonable." *Bauman*, 1984 WL 3255 at *6 (internal quotations omitted). Courts have "no special expertise in the operation of union affairs" but "union leaders have an obligation under the LMRDA to conduct a fair referendum and that duty must be enforced by the Court." *Id.* (citing *Sheldon v. O'Callaghan,* 497 F.2d 1276, 1282 (2d. Cir 1974)).

While the D.C. Circuit has interpreted Section 411(a)(1)'s guarantee that union members have "equal rights and privileges" in voting matters to "to encompass the right to a 'meaningful' vote," *Carothers*, 818 F.2d at 931-32, this assessment "can be judged only when all of the circumstances are considered." *Bauman*, 1984 WL 3255 at *7. This includes consideration of whether plaintiffs had "enough time and opportunity . . . to persuade their fellow members to reject or support" the union position. *Id.*

Nevertheless, any rights afforded to union members through the LMRDA's bill of rights "must be gleaned from the statute itself [and] may not be derived from a court's perception of what internal union procedures are necessary to guarantee a 'fully informed vote.'" *Carothers*, 818 F.2d at 934.

Indeed, federal courts should be "reluctant to take jurisdiction when it would require them to control and direct the entire conduct of union elections." *Bunz*, 567 F.2d at 1124. Although the LMRDA requires that unions abide by a democratic process, the LMRDA does not require "a union to turn the contract negotiation process into a forum in which dissident union groups (or outside groups working through union members) may utilize the union's own

resources to undermine its policies and processes." *Carothers*, 818 F.2d at 935. Accordingly, when a union has not violated the LMRDA, it "may not be ordered to supply the means by which those opposed to the union might seek to frustrate the performance of its collective bargaining responsibilities.*" Id.*

The plaintiffs allege that the APWU will violate their right to a "fully informed and meaningful vote" unless the Court directs the union to delay ratification of the new CBA for a minimum of thirty days in which time the plaintiffs hope to gain greater understanding of the agreement and organize opposition to ratification. Pls.' Decl., ¶ 15. The plaintiffs conceded during oral argument, however, that the time provided by APWU for consideration of the CBA has not varied significantly from the time periods provided for earlier ratification votes. Transcript of Oral Argument, Shelley v. Am. Postal Workers Union, No. 11-cv-677 (April 7, 2011) (Mr. Shelley: "The time doesn't vary too much from the ratification times in the past."). Yet, given the complexity of this CBA at issue, the plaintiffs assert that more time is needed. Indeed, the time period for consideration and ratification of the instant CBA is already significantly longer by over three weeks than two earlier CBA ratification votes. Powell Decl., ¶ 9. The plaintiffs further admit in their papers and during oral argument, that the APWU has been conducting an "unprecedented" program to educate union members about the new agreement. The union's effort has included a webinar, over a dozen lengthy briefing meetings across the country, information posted on the union website, mailed bulletins, and other information circulated electronically. While the plaintiffs criticize these efforts as merely designed to promote a 'yes vote,' Pls.' Decl. ¶ 7, the fact remains that these are clear, wide-ranging efforts to educate the union membership about the terms of the CBA.

In addition, the plaintiffs and others, who share their concerns about the merits of the CBA, have been busy countering the APWU's efforts, both at meetings and in online postings. Consequently, the plaintiffs have not shown that they are likely to succeed on the merits in showing that the APWU has failed to provide an adequate opportunity for the union members to be informed about the CBA and cast a meaningful vote.

### 3. Plaintiffs Have Not Shown Irreparable Injury

For the plaintiff to warrant injunctive relief, it must establish that it will face irreparable injury without immediate court intervention. This Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The injury "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The party moving for injunctive relief must demonstrate that "[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citations omitted). In addition, "the injury must be beyond remediation." *Id.*

Plaintiffs allege that they will face irreparable harm if referendum ballots are mailed because union members typically vote "quickly after receiving the ballot" and the opportunity to oppose the new CBA will be "greatly diminished" once union members receive ballots. Compl. at 4. Plaintiffs assert that it will be "virtually impossible to successfully organize a 'no vote'" and the CBA "will almost automatically receive a 'yes vote.'" *Id*. at 5; Pls.' Decl., ¶ 15. This, plaintiffs argue, will deny the plaintiffs an opportunity to "make a fully informed and meaningful vote" for which there is "no effective remedy." Compl. at 5-6.

Despite plaintiffs' assertion that most union members vote soon after receiving ballots and that organizing an opposition to the new CBA will be difficult after union members begin

voting, the plaintiffs have failed to show that the rights afforded to them under the LMRDA will be curtailed once ballots are mailed and voting begins. As noted earlier, the LMRDA secures equal rights and privileges when participating in union elections and voting, and this Circuit has additionally interpreted that to include a meaningful opportunity to vote. *See Bunz*, 567 F.2d at 1121. The plaintiffs have not alleged that the APWU is restricting, or will restrict, the plaintiffs' opportunity to express their opposition to the CBA, or are otherwise discriminating against them. Indeed, the plaintiffs may continue to express their opposition to the CBA through emails, flyers, conference calls, Facebook pages, and by organizing through local union representatives. Although it may be more difficult for the plaintiffs to convince union members to oppose ratification of the CBA once balloting has begun, there is no evidence on the record that the plaintiffs' rights pursuant to the LMRDA are being curtailed, infringed, or discriminated against by the national union. The plaintiffs cannot demonstrate irreparable injury stemming from the APWU's actions and, therefore, cannot maintain the showing of irreparable harm necessary for the Court to consider granting injunctive relief.

### 4. The Harm to APWU

The plaintiffs urge the Court to delay mailing of the CBA ratification ballots for thirty days in large part because "there will be little to no harm to the Defendant." Compl. at 6; Pls.' Decl., ¶ 16. To support this position, the plaintiffs indicate that many of the provisions of the CBA are not scheduled to be implemented for many months, and "any delay in the mailings will not cost the APWU any additional monies." Compl. at 6; Pls.' Decl., ¶ 16. Therefore, according to the plaintiffs, the only 'harm' to the APWU will be that those members who opposed the tentative CBA will be afforded a reasonable time to campaign against the tentative agreement. Compl. at 6; Pls.' Decl., ¶ 16.

Contrary to plaintiffs' contentions, the APWU has articulated the harms it would suffer if the Court grants the motion to delay ratification of the new CBA. Any Court order directing the APWU to depart from the normal procedure for CBA ratification would be perceived by union membership as a finding that the union leadership was improperly handling the negotiation and ratification of the CBA and cast doubt on the content of the CBA, even if the Court's action did not address the merits of the CBA's terms. This judicial interference in the timetable for ratification would have adverse consequences for the union leadership and would jeopardize the CBA's eventual ratification.

### 5. The Public Interest

The final factor in evaluating a motion for injunctive relief requires the Court to determine whether the public interest weighs in favor of granting the plaintiffs' motion. The plaintiffs contend that enactment of the LMRDA and its associated bill of rights indicates that "the principle of union democracy be upheld, and that the members of any union have a full opportunity to make an informed and meaningful decision regarding their conditions of employment." Transcript of Oral Argument, Shelley v. Am. Postal Workers Union, No. 11-cv-677 (April 7, 2011). While the plaintiffs are certainly correct that the LMRDA and its associated provisions demonstrate Congress's intent to ensure that labor organizations remain democratic and fairly represent its members, *see Carothers*, 818 F.2d at 934 (Title I of the LMRDA was "designed to ensure that unions adhere to certain basic democratic principles"), the LMRDA is not "a mandate for courts to impose on labor unions whatever procedures or practices they regard as 'democratic.'" *Id.* Absent a showing that union members' rights under the LMRDA will be violated, the Court is not to interfere with internal union affairs, such as the ratification of a collective bargaining agreement. *Bauman*, 1984 WL 3255 at *6 ("the court should not

interfere when the judgment of the union's leadership appears to be fair and reasonable" because courts have "no special expertise in the operation of union affairs").

Moreover, the APWU points out the "potential for very substantial irrecoverable monetary loss to the Postal Service from a delay in ratification," noting that the "Postmaster General testified that the Postal Service will save $3.8 billion over the 4.5 year period of the tentative agreement. That is an average of $65 million per month." Def.'s Mem., at 10.

The plaintiffs have failed to demonstrate that judicial intervention is appropriate in this case, or that they are entitled to the extraordinary relief of a temporary restraining order and a preliminary injunction.

## III. CONCLUSION

The plaintiffs moved for injunctive relief on the assertion that without delaying the ratification of the new CBA, they would not be afforded a fully informed and meaningful opportunity to vote on the agreement. The plaintiffs, however, do not argue that the APWU failed to comply with proper voting procedure or otherwise restricted the plaintiffs' ability to voice their dissatisfaction with the new CBA. Rather, the plaintiffs' primary contention is that they need more time to inform and convince other union members to oppose the agreement. This dispute does not rise to the level of a LMRDA violation and the Court therefore has no authority to grant the relief the plaintiffs seek. The plaintiffs have therefore failed to demonstrate a likelihood of success on the merits of their legal challenge. The plaintiffs have further failed to demonstrate that, without an injunction, they will be irreparably harmed. The APWU has not restricted their ability to oppose ratification of the new CBA and has not infringed on any right afforded to the plaintiffs under the LMRDA. Without a strong showing of a likelihood of success on the merits and irreparable harm, the plaintiffs have not established the need for

injunctive relief. Accordingly, for the foregoing reasons, the plaintiffs' motions for a temporary restraining order and a preliminary injunction is DENIED and this case is DISMISSED.

An Order consistent with this Memorandum Opinion will be entered.

**Dated: April 8, 2011**

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge